Patricia LYNCH, et al., Plaintiffs,

v.

Edward J. KING, et al., Defendants.

Civ. A. No. 78–2152–K.

United States District Court,
D. Massachusetts.

Sept. 20, 1982.

**327**

**KEETON, District Judge:**

This class action tests the jurisdiction and competence of the court to provide a remedy for a case of human tragedy. Simply and candidly stated, the facts are that children have suffered unspeakable injuries to body and spirit. They have suffered, it is true, because of circumstances beyond the reach of the most benign and effective protection any government has ever afforded. But, as well, children have suffered because state officials charged with protecting them have fallen short of what they undertook to do.

In the motion now before the court, plaintiffs seek relief designed to bring Massachusetts' foster care system into compliance with federal requirements the Commonwealth promised to fulfill as a condition of receiving federal funding. As to this request, however sufficient the plaintiffs' proof and the court's jurisdiction may appear, the stark reality is that judicial power to give effect to rights created by Congress is meager. No doubt a primary factor in the failure of protection of victimized children has been limited resources. And yet, ironically, the only relief the court can award is an order compelling state officials to give up some of those resources—funds appropriated by Congress—if federal requirements are not met. Thus, it may be that the only remedy the court can provide is a remedy that we shall later know to have been worse than none, and yet a remedy the court must grant when sought by persons legitimately entitled to demand it.

**I.**

In August of 1978, plaintiffs brought this action on behalf of themselves and a class later certified by the court,[1] alleging that Massachusetts' system for providing foster care and child welfare services violates the

Pamela Taylor, Jeffrey Witten Kobrick, Paula Barbara Mackin, Juvenile Law Reform Project, Boston, Mass., for plaintiffs.

Thomas Spirito, Com'r, Dept. of Public Welfare, Maureen L. Fox, Asst. Atty. Gen., Boston, Mass., Mary Jane England, Com'r, Dept. of Social Services, Paul F. Ware, Jr., Paul E. Nemser, Sp. Asst. Attys. Gen., Goodwin, Procter & Hoar, Boston, Mass., for defendants.

1. On February 27, 1980, the court certified a class defined as follows:

    All children subject to protective intervention by agencies of the Commonwealth of Massachusetts under the foster family home care system, in operation pursuant to 42 U.S.C. §§ 608, 625, and regulations promulgated thereunder, and Mass.Gen.Laws c. 119 §§ 23, 24, 51A, & 51B, and all members of the natural and foster families of such children.

due process clause of the Fourteenth Amendment, the Social Security Act (codified at 42 U.S.C. §§ 601 *et seq.*), and regulations promulgated by the Secretary of Health and Human Services ("the Secretary"). The case is currently before the court on plaintiffs' motion for a preliminary injunction, filed on August 7, 1981. Hearings on plaintiffs' motion, at which plaintiffs and defendants presented evidence, were held intermittently commencing on August 13, 1981 and terminating on June 9, 1982. Plaintiffs and defendants subsequently filed several written submissions. The court now grants, in part, the preliminary injunction sought by plaintiffs. This opinion sets forth findings of fact and conclusions of law.[2]

**2.** Statutes and administrative regulations written in sentences that run for a page or more and include subsidiary designations such as (a)(1)(A)(I)(i) are not noted for their readability. Judicial opinions that attempt to explain and apply them—including this one—may be little better. This footnote sketches the system of aid established by the statute and regulations, as I understand them. It includes conclusions reached and explained more fully later in this opinion. If this footnote is as plain as I mean it to be, you may wish to return to it if you lose your bearings while reading the statute and regulations, or the text of this opinion.

All statutory references here are to sections of 42 U.S.C., where the Social Security Act is codified. Titles IV–A, IV–B, and IV–E are parts of the Social Security Act, as amended. For convenience, the remaining paragraphs of this footnote are numbered.

(1) Title IV–A (codified at 42 U.S.C. §§ 601 *et seq.*) establishes a federal program of Aid to Families with Dependent Children–Foster Care (AFDC–FC). It is part of a broader program (AFDC) that applies as well when none of a family's children is in foster care.

(2) Federal funding for AFDC is delivered to families only through some state agency. Federal AFDC–FC payments are available only through a state plan that meets Title IV–A standards—standards stated in Title IV–A or in administrative regulations authorized by Title IV–A.

(3) Except as modified by Title IV–A, the statutes establishing the federal AFDC program provide no aid for children in foster care. However, the definition of "dependent child" in § 608(a) tells us, albeit only after careful analysis, that certain children in foster care who would have been eligible for aid had they not been in foster care are nevertheless eligible for aid even though as a result of being in foster care they are not in the family setting that would otherwise have made them eligible.

(4) Title IV–A imposes, as a condition of receiving federal AFDC–FC funds, an obligation that a state agency fulfill the federal standards contained in § 608 and implementing regulations. I conclude below that § 608 creates rights that enable one or more individuals to sue a state agency that receives and uses AFDC–FC funds and does not comply with federal standards. Meeting federal standards may require expenditure of state funds as well as the federal funds obtained by the state for use in AFDC–FC, and the court has no power to order unconditionally that the state agency do all that is necessary to meet federal standards. Rather, the court is limited to ordering the state agency either to meet federal standards or else cease spending any federal funds obtained for use in AFDC–FC.

(5) Section 608(f) requires the state agency to develop and periodically review a "plan" to assure that each eligible child in foster care receives proper care. Much of the dispute in this lawsuit is about whether Massachusetts has done enough to meet, first, the requirement that it have a "plan" for each foster child and, second, the requirement of periodic review. One of the regulations implementing Title IV–A contains a definition of a "plan," but that regulation applies only to specified territories and not to the fifty states.

(6) One disputed issue is whether the court may turn to Title IV–E (codified at 42 U.S.C. §§ 671 *et seq.*) for guidance with respect to what is a "plan" under Title IV–A. Title IV–E was enacted in 1980. It replaces Title IV–A on October 1, 1982 at the latest, and earlier in some circumstances. It includes (in § 675), an explicit definition of a "plan." I conclude that I cannot properly look to that definition in determining whether defendants have violated Title IV–A. But, having found violations of Title IV–A, I do take account of Title IV–E in fashioning the order regarding defendants' future conduct.

(7) Title IV–B (codified at 42 U.S.C. §§ 620 *et seq.*) makes available to states additional federal funds to help states extend social services aimed at ensuring permanent and proper homes for children. It aims to help the foster children who are aided by AFDC–FC and other children as well. Section 627, which is part of Title IV–B, as amended in 1980, imposes on the state agency, in specified circumstances met here, an obligation to fulfill the requirements of a "plan" and periodic review stated and defined in §§ 675(1), (5) of Title IV–E. I conclude below that § 627 creates rights that enable one or more individuals to sue a state agency that receives federal funds and does not meet the requirements of §§ 675(1), (5). The state agency's obligation under § 627 extends to each child receiving foster care "under the supervision of the state." Thus, the rights established

At the outset, it is important to determine which of the many provisions of the Social Security Act and implementing regulations[3] cited in various submissions by plaintiffs are now before the court as bases of claims for preliminary relief. Plaintiffs' complaint, alleging generally in paragraph 1 "defendants' failure to comply with . . . 42 U.S.C. §§ 608, 625 and 45 C.F.R. §§ 220.1 et seq.," asserts causes of action under the provisions codified at 42 U.S.C. § 608 and 45 C.F.R. §§ 1392.40, 1392.-40(b)(3), 1392.3, and 1392.5. See ¶¶ 80–86. Elsewhere in the complaint, plaintiffs indicate that the specific regulatory provisions upon which they rely are 45 C.F.R. §§ 1392.40(b)(3), 1392.5(a), 1392.3(b), and 1392.10. See ¶ 38. In the memorandum of June 9, 1981, the court, in considering defendants' motion to dismiss, examined only plaintiffs' claims under 42 U.S.C. § 608 and 45 C.F.R. §§ 1392.40(b)(3), 1392.5(a), 1392.-3(b), and 1392.10. With respect to plaintiffs' claims of entitlement to "services,"[4] the court concluded that, of the provisions examined, only 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3) serve as proper bases for these claims by creating rights enforceable in an action under 42 U.S.C. § 1983. See June 9, 1981 Memorandum and Order, at 18. At that time, however, the court did not consider the effect on plaintiffs' claims of the Adoption Assistance and Child Welfare Act of 1980 ("the 1980 Act"), Pub.L. No. 96–272, 94 Stat. 518 (1980).

In their motion for preliminary injunction filed August 7, 1981, plaintiffs claim under a regulation, 45 C.F.R. § 1392.92, not cited in their complaint and not examined in the memorandum of June 9, 1981. In submissions filed after the close of the hearings on plaintiffs' motion for preliminary injunction, plaintiffs seek to rely on additional provisions neither referred to in their complaint nor previously examined by the court. See, e.g., Plaintiffs' Proposed Order, June 15, 1982; July 26, 1982 Letter accompanying Plaintiffs' Opposition to Defendants' Motion.

Although they indicated in their most recent submission that they would do so, see Plaintiffs' Memorandum in Response to the

---

by § 627 are rights from which no subgroup of children—such as those in foster care under the AFDC–FC program—is excluded.

**3.** In addition to claims under the Social Security Act and various implementing regulations, plaintiffs assert in their complaint violations of the due process clause of the Fourteenth Amendment. In the June 9, 1981 memorandum and order, the court deferred consideration, pending further development of the facts of the case, of the question whether plaintiffs' allegations under the due process clause state claims upon which relief may be granted. See June 9, 1981 Memorandum and Order, at 5 n. 5, 19. In their motion for preliminary injunction filed August 7, 1981, plaintiffs ask the court to consider their federal constitutional claims only in the event that defendants choose to cease spending federal funds in lieu of bringing their foster care and child welfare systems into compliance with applicable federal statutes and regulations. See also Plaintiffs' Proposed Order, at 15.

**4.** For the purpose of considering defendants' motion to dismiss, the court distinguished between two categories of claims asserted by plaintiffs: (1) "services claims," or claims that the foster family care and child welfare services provided by defendants fail to meet standards implicit in the due process clause and contained in the Social Security Act and implementing regulations; and (2) "separation decision claims," or claims that defendants separate children from their natural parents without exploring less intrusive alternatives, in the absence of an ascertainable threshold of harm, without adequate procedural safeguards, and without determining when and how such children can be reunited with their natural parents, all in alleged violation of the due process clause and section 608 of the Social Security Act.

In the June 9, 1981 memorandum and order, the court concluded that

> because section 608 [of the Social Security Act] does not explicitly condition the granting of federal funds on the use by participating states of particular standards or procedures for making separation decisions, . . . paragraphs 83–86 do not state violations of 42 U.S.C. § 608 insofar as they relate to defendants' standards and procedures for making separation decisions.

June 9, 1981 Memorandum and Order, at 19. As noted above, the court deferred, pending further development of the facts of the case, the determination whether plaintiffs' allegations that defendants violate the due process clause in making separation decisions state claims upon which relief may be granted. Id.

Court's Procedural Order, at 2, plaintiffs have not filed a motion to amend their complaint to include causes of action under the provisions, other than 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3), cited in their submissions filed after June 9, 1981. Defendants have objected to plaintiffs' assertion of rights to relief under any provisions other than 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3). In these circumstances, I conclude that it is appropriate, for purposes of the current motion, to consider only claims under 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3). As explained more fully below, however, see parts IV.A, V.A., infra, because of special problems created by the amendments effected by the 1980 Act, I will also consider provisions in Title IV–B (42 U.S.C. §§ 621 et seq.) and Title IV–E (42 U.S.C. §§ 671 et seq.) that contain requirements analogous to those found in 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3).[5] Plaintiffs are, of course, free to file, before the trial on the merits in this case, a motion to amend their complaint to state claims under any statutory provisions or regulations not considered here.

## II.

In the First Circuit, a plaintiff seeking a preliminary injunction bears the burden of satisfying four criteria:

> (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits, and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Massachusetts Association for Retarded Citizens v. King,* 668 F.2d 602, 607 (1st Cir. 1981), quoting *Massachusetts Coalition of Citizens v. Civil Defense Agency,* 649 F.2d 71, 74 (1st Cir.1981).

Each of these criteria, with respect to plaintiffs' claims under 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3) and relevant analogous provisions, is considered below.

---

5. Fed.R.Civ.P. 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Whether a defendant has consented by implication to the trial of claims or issues not set forth in the complaint is not an easy matter to determine. A significant, if not essential, factor in finding implied consent is a finding that the defendant *"recognized* that an issue not presented by the pleadings entered the case at trial." C. Wright and A. Miller, Federal Practice and Procedure § 1493, at 462 (1971) (emphasis added). Ordinarily, when a defendant *"knowingly acquiesces* in the introduction of evidence relating to issues that are beyond the pleadings," the extra-pleading issues are treated as if they had been raised in the complaint. *Id.* at 462–63 (emphasis added). However,

> [w]hen the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the subject matter of the amendment, and there was no indication at trial that the party who introduced the evidence was seeking to raise a new issue, the pleadings will not be deemed amended under the first portion of Rule 15(b).

*Id.* at 466 & n.71 and cases cited therein.

In this case, it is true that plaintiffs introduced evidence that may be viewed as relevant to claims under provisions other than 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3). It is also true, however, that, in light of the complexity of the issues presented with respect to plaintiffs' claims under sections 608 and 1392.-40(b)(3), evidence relevant to claims under any additional provisions may well have been perceived by defendants simply as proof of plaintiffs' assertions under sections 608 and 1392.-40(b)(3) and not as evidence raising issues or claims not pleaded. In these circumstances, I conclude that it would be inappropriate to find implied consent on the part of the defendants to try issues or claims not stated in plaintiffs' complaint.

On the other hand, since the court, before the close of the evidence, explicitly raised issues relating to the effect of the 1980 Act—and inquired particularly about the availability of relief under provisions of Titles IV–B and IV–E—I conclude that it is not unfair or prejudicial to the defendants to consider provisions of Titles IV–B and IV–E containing requirements analogous to those found in 42 U.S.C. § 608 and 45 C.F.R. § 1392.40(b)(3). *See* part IV.A. *infra,* concluding that it is appropriate to fashion relief designed to secure compliance with relevant requirements of Title IV–E. *See also* part V.A. *infra,* finding that certain claims under section 627(a)(2)(B) of Title IV–B were tried with the implied consent of the defendants.

## III.

### *Claims Under 42 U.S.C. § 608*

A. Likelihood of Success on the Merits

Plaintiffs allege that defendants have violated 42 U.S.C. § 608 by

... failing to develop and periodically review service plans and by failing to provide social services to prevent the initial or on-going need for foster care and/or to improve conditions in natural homes ...

Plaintiffs' Complaint, ¶ 80; and by

... failing to provide adequate numbers of trained and qualified social workers to evaluate plans, to develop and review service plans and to provide social services ...

Plaintiffs' Complaint, ¶ 82.

42 U.S.C. § 608 is part of Title IV–A, establishing the Aid to Families with Dependent Children-Foster Care program ("AFDC–FC"), which is one component of the Aid to Families with Dependent Children program ("AFDC") created by the Social Security Act. In *King v. Smith,* the Supreme Court summarized the legal framework of AFDC as follows:

> The AFDC program is based on a scheme of cooperative federalism ... States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available ... are required to submit an AFDC plan for the approval of the Secretary [of Health and Human Services] ... The plan must conform with several requirements of the Social Security Act and with rules and regulations promulgated by [the Secretary].

392 U.S. 309, 316–17, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968) (citations omitted).

42 U.S.C. § 602(a) requires that "a State plan for aid and services to needy families with children ... (20) ... provide for aid to families with dependent children in the form of foster care in accordance with section 608 of this title." Section 608 limits federal payments for such aid to those states "whose State plan approved under section 602 of this title—

(e) includes aid for any child described in paragraph (a) of this section,[6] and

(f) includes provision for (1) development of a plan for such child (including periodic review of the necessity for the child's being in a foster family home or child care institution) to assure that he receives proper care and that services are provided which are designed to improve the conditions in the home from which he was removed or to otherwise make possible his being placed in the home of a

---

**6.** 42 U.S.C. § 608(a) defines a "dependent child" to whom AFDC–FC benefits must be provided as

a child (1) who would meet the requirements of such section 606(a) or of section 607 of this title except for his removal after April 30, 1961, from the home of a relative (specified in such section 606(a)) pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian, or as a result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child, (2) whose placement and care are the responsibility of (A) the State or local agency administering the State plan approved under section 602 of this title, or (B) any other public agency with whom the State agency administering or supervising the administration of such State plan has made an agreement which is still in effect and which includes provision for assuring development of a plan, satisfactory to such State agency, for such child as provided in paragraph (f)(1) and

such other provisions as may be necessary to assure accomplishment of the objectives of the State plan approved under section 602 of this title, (3) who has been placed in a foster family home or child-care institution as a result of such voluntary placement agreement or judicial determination, and (4) who (A) received aid under such State plan in or for the month in which such agreement was entered into or court proceedings leading to such determination were initiated, or (B)(i) would have received such aid in or for such month if application had been made therefor, or (ii) in the case of a child who had been living with a relative specified in section 606(a) of this title within 6 months prior to the month in which such agreement was entered into or such proceedings were initiated, would have received such aid in or for such month if in such month he had been living with (and removed from the home of) such a relative and application had been made therefor; ...

relative specified in section 606(a) of this title . . .

As noted above, the court concluded in the June 9, 1981 Memorandum and Order that 42 U.S.C. § 608 creates rights enforceable by plaintiffs in an action brought under 42 U.S.C. § 1983. In this opinion the court is called upon to define the scope of the rights secured by section 608(f), to determine whether plaintiffs have proved violations of those rights sufficient to justify preliminary relief, and, if so, to fashion an appropriate remedy.

As might be expected, plaintiffs and defendants hold differing views of the obligations imposed on the Commonwealth, under section 608(f), as a condition of receiving federal funding. Three components of section 608(f) are in dispute: (1) what is necessary to fulfill the requirement of development of a "plan" to assure that the foster child receives proper care and that services are provided designed to improve the conditions in the child's original home; (2) whether the state must provide services designed to ensure proper care for the child and to improve conditions in the child's original home, as part of the requirement of the plan; and (3) what is required to satisfy the mandated periodic review.

### 1. Requirements of Section 608(f)

#### (a) The Plan

■ As to what is required to comply with section 608(f)'s requirement of a "plan" ("case plan"), plaintiffs and defendants disagree about both the form and the content the plan must take. Defendants argue that the case plan need not be maintained in any particular form, indeed that it need not even be in writing. They urge the court to adopt, as a framework of analysis, the description of a service or "case plan" set forth in *Florida v. Mathews,* 422 F.Supp. 1231 (D.D.C.1976):

> There was a service plan concept in the federal social services program for many years. No specific format or definition of a service plan was provided by HEW and

state practice varied widely. The concept of a service plan involves the identification of a goal to be achieved by the provision of service to a person with a problem. There need be no single document or series of documents establishing a service plan, although this is not precluded. There need be no special study, as had been commonly employed in the past and which some states continued to utilize for AFDC cases. A service plan is often inferred from the course of dealings between the recipient and the service worker or provider. A service plan was to aid in identifying the services needed by a recipient and to facilitate the provision of those services. It is a technique for expanding service delivery.

*Id.* at 1235.

Plaintiffs, on the other hand, contend that section 608(f) should be interpreted to include very specific requirements, including a requirement that the plan be in writing in a single entry in the case file. As potential sources of those requirements, the plaintiffs refer the court to: (1) the criteria for a case plan used by the Administration for Children, Youth and Families ("ACYF") within the U.S. Department of Health and Human Services ("HHS") in conducting program reviews of child welfare services in the states; (2) the definition of a case plan set forth in 42 U.S.C. § 675(1), part of the new Title IV–E program established by the 1980 Act; and (3) the definition of a case plan to which Dr. Alan Gruber, one of plaintiffs' experts, testified.

Determining what is required under section 608(f) is not an easy matter. Ordinarily, the views of an agency charged with enforcing a statute are to be given great deference by a court in interpreting the statute's requirements. *United States v. Rutherford,* 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979). Here, however, the only regulations promulgated by the Secretary of HHS do not contain any specific requirements for the format or content of the statutorily prescribed case plan. 45

C.F.R. § 1392.16.[7] Moreover, the Program Review Manual for Child Welfare Services cited by plaintiffs does not indicate that the case plan requirements set forth therein are to be used in determining the states' compliance with the requirements of Title IV–A, or that the states were ever apprised that the criteria contained in the manual would be used for this purpose. Ex. 55. In these circumstances, I conclude that it would not be appropriate to hold the Commonwealth to the standards established by ACYF in its program review manual, in determining the Commonwealth's compliance with the dictates of section 608(f).

Nor would it be proper, at this juncture, to incorporate the definition of a case plan set forth in section 675(1) of Title IV–E, created by Congress in the 1980 Act. It is true, as plaintiffs contend, that Title IV–E contains many provisions analogous to those found in Title IV–A, one of which is the requirement of a case plan. It does not follow, however, that the criteria for a case plan stated in section 675(1) should be incorporated by the court into section 608(f), on the theory that section 675(1) merely codifies the case plan requirements that Congress intended in enacting section 608(f).

The legislative history on this point is not entirely clear. There are references, in the legislative history of Title IV–E, to section 608(f) that support plaintiffs' argument that, from its inception, section 608(f) mandated certain requirements for case plans. For example, Senator Cranston, in discussing the need for reform of the Title IV–A program, observed that "[t]he GAO investigation [conducted in 1977 at Cranston's initiation] ... found a widespread failure to include in the case plans developed for foster children vital information in the case plans—as required under section [608(f)] of existing law." 125 Cong.Rec. S15289 (daily ed. Oct. 29, 1979). At the same time, there are indications, in statements by the same Senator, that the detailed requirements in section 675(1) were adopted precisely because section 608(f) did not provide enough guidance to the states regarding their obligations with respect to case plans. Senator Cranston, in discussing section 608(f) and the states' compliance, noted that:

> ... Unfortunately, the evidence is all too clear that there has been little, if any, compliance with this *generalized* requirement. As I mentioned before, the 1977 GAO investigation of foster care placement found a widespread failure to include vital information in the case plans developed for foster children. Indeed, only one-third of the children reviewed in the GAO investigation had received case reviews. The GAO report noted that *current federal requirements for case plans are "very general and do not require that the plans be documented."*

---

**7.** 45 C.F.R. § 1392.16, which appears under the heading "Mandatory Services Applicable to Title IV, Part A," reads as follows:

(a) A service plan must be developed and maintained on a continuous basis for each family and child who requires service to maintain and strengthen family life, foster child development and achieve permanent and adequately compensated employment.

(b) By January 1, 1970, a service plan must be developed for each family and child in the current caseload and, within 1 year following approval for financial assistance for those added to the caseload after March 31, 1969.

(c) Such plans must be developed in cooperation with the family and must be responsive to the needs of each individual within the family, while taking account of the relation of individual needs to the functioning of the family as a whole. Families shall have the right to accept or reject such plans. (See 45 CFR Part 224 for special provisions on refusal without good cause under the WIN program and referral of Unemployed Fathers to the WIN program.)

(d) Service plans must, as a minimum, include the objectives and content of the service requirements in §§ 1392.15–1392.24.

(e) Each service plan must be reviewed as often as necessary, but at least annually, to assure that it is practically related to needs and is being effectively implemented.

Regulations in Part 1392 implementing Title IV–A apparently apply only to certain U.S. territories and not to the fifty states. *See* § 1392.-1(a); Editorial Note to 45 C.F.R. Part 1392. Thus, even if 45 C.F.R. § 1392.16 contained detailed criteria for the mandated case plan, it would be open to question whether the court could use those requirements to give content to 42 U.S.C. § 608(f), as applied to the Commonwealth.

The legislation as reported would *strengthen the provisions in existing law* by describing exactly what factors should be included in the case plan ...

It is our hope that these specific requirements will assist in providing the kind of focus for case plans *that is missing under current law* and is needed to reduce unnecessary foster care.

*Id.* at 15290–91 (emphasis added).

The Supreme Court has stated that "... if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). Given that section 608(f) does not state that the plan must be in writing and does not enumerate specific contents for the plan, and in light of the failure of the legislative history to indicate clearly that the requirements imposed in section 675(1) were intended under section 608(f), I conclude that section 608(f) does not incorporate the criteria set forth in section 675(1), including the requirement that the plan be in writing.

Finally, this court cannot adopt, as requirements of section 608(f), Dr. Gruber's opinion of what should be included in a case plan. Regardless of the expertise of Dr. Gruber, his opinions do not have the force of law.

The difficulty created by these conclusions is that the court is left with little guidance as to what section 608(f) *does* require of the states with respect to case plans. If a case plan need not be in writing and does not have to include specific information, what *is* a case plan? In the absence of Congressional intent or applicable regulations indicating a less amorphous definition, I conclude that the essence of a case plan under section 608(f) is "the identification of a goal to be achieved by the provision of services," *Florida v. Mathews,* 422 F.Supp. at 1235, and a plan or course of action—that need not be specified in writing in a single document—to furnish those services. In this case, the services that are the focus of the plan are those needed to ensure proper care for the foster child and to improve the conditions in the home from which he or she was removed. Congress clearly intended that some requirement of planning for appropriate services be imposed on the states. If this minimal definition were not formulated, section 608(f) would be rendered devoid of all meaning.

The problem, from plaintiffs' perspective, is one of proving the absence of something as elusive as the case plan defined above. Were the case plan required to be in writing, plaintiffs could rely on evidence of the absence of written case plans in significant numbers of cases to prove a violation of the statute. Yet, because section 608(f) does not mandate a written plan, plaintiffs could, theoretically, be required to introduce evidence of the states of mind of substantial numbers of DSS employees to show that they had formulated no identification of and course of action for provision of services to children and their families. I decline to impose such a harsh burden of proof, absent evidence that Congress intended it. Instead, I conclude that absence of required case plans may be shown, circumstantially, by evidence of lack of delivery of services intended as the subject of those case plans together with proof of absence of written case plans. If plaintiffs have proved that DSS employees provide neither written case plans nor appropriate services in a significant number of cases, then the inference may be drawn that these employees have not formulated the required identification of and plan for provision of those services. Defendants, as the parties having greater access to and control of Department of Social Services ("DSS") employees and case records, may, of course, rebut plaintiffs' case by proving that its employees did formulate the required case plans. This proof may be supplied either directly, through testimony of DSS employees, or circumstantially, through proof of the existence of written case plans or delivery of appropriate services. In the absence of such proof, the inference may be drawn that the Department—as the party having greater access to and control of the evidence—lacked it. *Cf. International Union,*

*UAW v. NLRB,* 459 F.2d 1329, 1336–37 (D.C.Cir.1972) (discussing common law adverse inference rule).

Findings with respect to compliance with the case plan requirement are stated in part III.A.2. below.

### (b) Services

■ The second major controversy between plaintiffs and defendants centers around whether section 608(f) requires the provision of services designed to ensure proper care for the foster child and to improve conditions in his or her original home. The issue here is not whether a plan or course of action is formulated, but whether it is implemented. Citing 45 C.F.R. § 1392.19,[8] among other provisions, plaintiffs argue that section 608(f) requires that the state, in addition to devising a case plan, carry out the plan by providing services reasonably calculated to achieve the goals stated in the statute. Defendants, on the other hand, contend that no services need actually be provided by the state under the statute.

In part IV.B *infra,* I conclude that, whether or not section 608(f) of Title IV–A imposes an obligation to provide services, the new Title IV–A, which takes effect on October 1, 1982, does not require the states to provide reunification services until October 1, 1983. Given this conclusion, I need not determine whether section 608(f) requires the Commonwealth to provide services. Even if section 608(f) imposes such an obligation, it would be inappropriate to enforce it, in light of the impending replacement of Title IV–A with a new statute that does not currently mandate that the state provide services.

### (c) Periodic Review

■ Section 608(f) provides that, as part of the plan for each foster child, the state must include "periodic review of the necessity for the child's being in a foster family home or child care institution." Defendants argue that the statute does not require that the review take any particular form or be conducted by any particular person(s) or body, or that the product of the review be contained in a specific document, or that the review be performed within any particular time frame. Defendants argue also that the only issue that need be reviewed is the necessity for substitute care. Plaintiffs do not affirmatively argue for an alternative interpretation, although they contend, generally, that the criteria set forth in Title IV–E should be incorporated into provisions in Title IV–A containing analogous requirements.

For reasons similar to those stated in the analysis of the case plan requirement, *supra,* I conclude that the requirements of section 675(5) are not incorporated in the periodic review provision of section 608(f). This does not mean, however, that the requirement of periodic review is meaningless. Periodic review, as that concept is used in the statute and in the social services context generally, is designed to ensure that the plan for the foster child is adapted to changing circumstances. It is designed to ensure that, in light of current conditions, the child's placement in foster care continues to be necessary and appropriate to his or her needs. Indeed, the statute defines periodic review as something "included" in the development of the plan,

**8.** 45 C.F.R. § 1392.19 provides as follows:

Effective July 1, 1969, services must be provided for children receiving aid in the form of foster care under title IV—Part A, to:

(a) Assure placement appropriate to the needs of each child.

(b) Assure that 'the child receives proper care in such placement.

(c) Determine continued appropriateness of and need for placement through periodic reviews, at least annually.

(d) Improve the conditions in the home from which the child was removed, so that

the child may be returned to his own home, or otherwise plan for the placement of the child in the home of other relatives, adoptive home or continued foster care, as appropriate.

(e) Work with other public agencies that have responsibility for the placement and care of any such children to assure that these agencies carry out their responsibilities in accordance with their agreement with the State agency administering or supervising the administration of AFDC.

implying that it is an integral part of a case plan that remains dynamic, being modified in light of the ongoing developments in the foster home, the home from which the child was removed, and the child's circumstances generally. Because of the findings reached below, it is not necessary to determine the specific time period within which the statute requires periodic review to be conducted.

## 2. The Evidence

■ Numerous DSS social workers, from different offices and at varying levels of experience and responsibilities, testified that they are unable to provide written service plans in most of their cases, and unable to deliver services to ensure proper care of children in foster care and services designed to make it possible for these children eventually to return to their original homes. A clear theme emerged from the testimony of these Department employees. Because of pressures created by heavy caseloads, they are relegated to responding to crises in their cases. They do not have time to engage in appropriate planning and review, or to furnish the ongoing supervision and services they feel are necessary to assure appropriate care for foster children and to improve the conditions in the homes from which they were removed. See, e.g., Affidavits of Lee Chamberlain (Social Worker ["SW"] III, Brockton Area office); Robert Moro (SW II, Blackstone Valley Area office); Peter Barrows (SW II, James Street office of Area 38); Donna Boyd (SW II, James Street office); Judith Hart (SW I, James Street office); Barbara Headrick (SW III, Greenfield Area office); Roberta Caulfield (SW I, Quincy Area office); Katherine Knowles (SW III, Brockton Area office); Steven Sylvia (SW II, Brockton Area office).

Most of these social workers testified, on the basis of their experience, that their failure to plan for and deliver appropriate services was causing harm to the children—including children in foster care—under their supervision. Some provided examples of cases in which harm befell foster children

as a result of lack of proper attention and provision of appropriate services. See, e.g., Affidavit of Donna Boyd. Moreover, files of actual cases revealed several instances in which children in foster care suffered serious emotional and physical injury—and even death—that could have been prevented. Only less serious injury or none would have been sustained had the Department taken reasonable steps to ensure the safety and welfare of these children. See, e.g., Ex. 9–E–9, Ex. 10–F–9, and Tr. 5/5/82, at 85–101; Ex. 9–E–2, Ex. 10–F–2, Tr. 5/3/82, at 86–97; Ex. 7–C–5, Ex. 8–D–5, and Tr. 4/28/82, at 21–31, 5/3/82, at 201–03; Ex. 7–C–10, Ex. 8–D–10, Tr. 4/29/82, at 29–41.

This evidence of lack of planning and service delivery is supported by a program review conducted in Massachusetts on February 1–5, 1982, by the Regional Children's Bureau Division of ACYF. Based on a sample of at least 300 case records, the program review indicated that the Commonwealth was "seriously deficient" in providing written case plans for each child and family receiving services. The Children's Bureau Division found that 20 per cent of all foster care cases do not have written case plans. Of the foster care cases that did have written case plans, 37 per cent were incomplete. The goals of the case plans that did exist were not met in 17 per cent of the cases.

This evidence of lack of written case plans and failure to furnish services that would be the subject of case plans is sufficient circumstantial proof to warrant a finding that DSS is failing, in significant numbers of cases, to provide the case plans mandated by section 608(f). In light of this evidence and of defendants' failure to produce proof sufficient to negate it, and on a preponderance of the evidence in the case as a whole, I find that plaintiffs have demonstrated a likelihood of success on the merits of their claim that DSS is violating 42 U.S.C. § 608(f) by failing to provide case plans to AFDC–FC children.

With respect to noncompliance with the statutory mandate of periodic review, plaintiffs presented testimony of social workers

indicating that, due to the volume of cases they carry, they are unable in substantial numbers of cases to complete the quarterly reviews required by the Department. Also, the Children's Bureau program review indicated that 17 per cent of foster care cases in which written case plans existed had not been reviewed within the last six months. The most significant proof, though, of the failure to provide periodic review is evidence of lack of case plans. It is difficult to see how periodic review could be conducted when there is no plan to review. One could hypothesize that, even in the absence of a case plan, a social worker could periodically reassess whether foster care is necessary and appropriate for the child. But attempting to make such a determination without considering whether goals for the child and the child's family—the proper subjects of a case plan—have been met would have little utility or meaning. Considering all this proof as circumstantial evidence of failure to perform periodic review, I find, on a preponderance of the evidence, that plaintiffs have shown a likelihood of succeeding on their claim that DSS is in violation of the periodic review requirement of section 608(f).

I recognize that there are certain weaknesses in plaintiffs' proof. For example, some of the social worker testimony regarding failure to formulate case plans and conduct periodic review does not clearly separate out foster care cases from other child welfare cases. And none of the evidence offered distinguishes between children in foster care under Title IV–A and those in foster care under Title IV–B. It would therefore be difficult, on the proof submitted, to reach a finding with respect to the precise number of AFDC–FC cases in which case plans and periodic review are not being furnished.

These flaws are not fatal to plaintiffs' motion for preliminary injunction, however. Defendants, as the parties having greater access to and control of relevant evidence, have offered little proof to rebut the powerful inference that case plans and periodic review are not being provided in significant numbers of cases involving children in foster care.[9] In addition, plaintiffs' access to evidence may have been hampered by actions taken by the Commissioner of DSS during the course of this litigation. *See* January 28, 1982 Memorandum and Order. Plaintiffs need not actually prove their case at this juncture. They have shown that more probably than not they will do so.

**9.** Citing 42 U.S.C. § 604(a)(2), defendants argue that this court may not provide a remedy if it finds that the state is in "substantial compliance" with the requirements of § 608(f). Section 604(a)(2) provides that if the Secretary of HHS finds that in the administration of a Title IV–A plan approved by the Secretary, "there is a failure to comply substantially with any provision required . . . to be included in the plan," the Secretary must withhold further payments of federal moneys to the state until he is satisfied that there is no longer any such failure to comply.

There is a split of authority among the circuits on the question whether a district court has the power to require full compliance with the terms of a statute establishing a scheme of cooperative federalism, or may remedy only violations of such magnitude that it can be said that the state has not substantially complied with the requirements of the statute. *Compare, e.g., Smith v. Miller,* 665 F.2d 172, 177–78 n. 6 (7th Cir.1981) (upholding district court's injunction ordering the Illinois welfare department to process applications for medical services within the time limits prescribed by 42 U.S.C. § 1396(a)(8) and the implementing regulation, where the department "ha[d] failed to meet federal standards in processing only a small percentage of applications, in one isolated segment of the total program") *with Shands v. Tull,* 602 F.2d 1156 (3d Cir.1979) (reversing district court's order enjoining the state of New Jersey from violating a federal regulation implementing 42 U.S.C. § 602(a), where New Jersey had achieved substantial compliance by meeting the 90-day limit prescribed in the regulation in 96% of all AFDC appeals).

I need not resolve this question in this case. Although the evidence would not permit assignment of a specific number to the AFDC–FC cases in which the Department has failed to meet its obligations, it does indicate a widespread lack of provision of case plans and periodic review in foster care cases in general, and indeed, in child welfare cases of all types. I therefore find that plaintiffs have shown a likelihood of proving, at trial on the merits, that defendants have failed to achieve substantial compliance with the case plan and periodic review requirements of section 608(f), mandated for AFDC–FC children.

### B. Irreparable Injury

The second factor the court must consider is whether plaintiffs will suffer irreparable injury if preliminary relief is not awarded. Plaintiffs bear the burden of satisfying a stringent standard. As the First Circuit has stated:

> Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined .... A preliminary injunction will not be issued simply to prevent a mere possibility of injury. A presently existing, actual threat must be shown.

*Massachusetts Coalition of Citizens v. Civil Defense Agency,* 649 F.2d 71, 74 (1st Cir. 1981).

I find that plaintiffs have met this burden. The evidence shows that, if the court fails to grant preliminary relief, there is a very real threat that great harm will befall children in foster care in Massachusetts. The physical and emotional damage threatening these children, should it occur, could never be undone.

Plaintiffs have demonstrated, by a preponderance of the evidence, that the Department fails to provide case plans and periodic review to significant numbers of children in foster care. The case plan is the very foundation of the system of protection for a foster child. It is a blueprint of the steps that must be taken, and services that must be provided, to ensure the safety and welfare of the child. Without such a plan, the worker responsible for the child's supervision simply cannot address adequately the child's needs. Indeed, without a case plan, the worker may not address those needs at all. The same is true of periodic review. Through periodic review, the worker updates and reassesses the original plan of action for caring for the child, taking into account changed circumstances in the child's life.

Thus, without a case plan and periodic review, the psychological and bodily safety of the child is at serious risk, for there is no guarantee that anyone is looking out for his or her interests. A dramatic illustration of this point is the case of two children in DSS care who were killed in a fire. The last contact by one of the children's social worker had taken place a year before the fire in which the children died. The worker who had been assigned the case of this foster child was carrying 23 cases at the time of the assignment. The DSS case review unit report on the case revealed that the worker had failed to engage in the planning necessary to lead to the discovery that the foster child for whom the worker was responsible was in danger. Tr. 8/3/81, at 62–63.

In addition to risk of emotional and physical injury inflicted in the foster home, a child in foster care faces another type of harm without a case plan and periodic review. The child is confronted with the threat of simply drifting along in foster care, without ever coming to rest in a permanent family setting. A case plan, periodically reviewed, is necessary to ensure that the child does not become lost in the foster care system. Indeed, the Congress that enacted the 1980 Act envisioned, as essential safeguards for preventing the foster care drift that has characterized the plight of abused and neglected children in this country, requirements of case planning and review more stringent than those the Department is now violating:

> [Children in foster care] can be likened to criminals who face a long sentence, but, unlike criminals, they have done nothing wrong—their greatest crime is being abused or neglected by their parents. They enter foster care for a "temporary" period which in most cases lasts a good portion of their childhood. During these years a child can be placed in as many as five foster homes or institutions ....
>
> In a majority of the cases, there are little or no attempts to reunite the child with the natural family.... [B]ecause of the heavy caseloads of the caseworkers, many children are placed in homes that do not provide proper care of a proper environment for the child. The enactment of this legislation would require a written case plan on each child, which will have a description of the home or

institution in which the child is to be placed, including a discussion of the appropriateness of the placement. A review of this case plan will occur every 6 months with a dispositional hearing no later than 18 months after placement. Therefore, with the passage of H.R. 3434, instead of being faced with a rootless insecurity, these children can now be assured a more stable and more permanent family setting.

125 Cong.Rec. H7097 (daily ed. Aug. 2, 1979) (statement of Congressman Rostenkowski).

It has been over a year now since the first hearing on plaintiffs' motion for preliminary injunction. The hearing and adjudication of a trial on the merits in this case would, most likely, require at the least another comparable period of time. A year is a very long time in the life of a child. During that period a child can suffer irreversible harm. The injury caused by physical or mental abuse in a foster home, or emotional insecurity bred by the lack of a secure and loving environment, is beyond the power of any court to remedy. Without case plans and periodic review, children in foster care in the Commonwealth face a grave threat of such harm.

### C. Balance of Hardships

Having found that plaintiffs are threatened with irreversible bodily and emotional injury, the court must consider whether this harm outweighs any harm that would be inflicted on defendants by the granting of preliminary relief.

Arguing that the balance of harms tilts in their favor, defendants characterize the hardship that would be imposed on them by the award of preliminary relief as follows:

The defendants' interest consists in freedom from a burdensome judicial order that will disrupt the management of [DSS], including delivery of the very services plaintiffs seek. For a court to intrude in the present case is to risk demoralizing agency personnel and engendering cynicism in an improving administration; to substitute judicial judgment for that of trained professionals and

a legalistic atmosphere for a therapeutic one; to risk a confrontation with the state legislature; to risk stripping funds from crucial programs in order to pay for others receiving judicial attention; to risk forcing the state to give up badly needed federal funds, rather than comply with a far more costly judicial order.

The problem with defendants' argument is that it proves too much. Defendants merely raise concerns of federalism that are present in any case in which a class of plaintiffs seek the aid of a federal court in securing state compliance with federal law. To be sure, it is essential for federal courts to be ever sensitive to these considerations. Every federal judge must be concerned about the prospect of issuing relief that unduly hampers the day-to-day administration of a state agency. And every federal judge must be concerned about the effect of granting the only remedy ultimately available—an order that the state cease spending badly needed federal funds. This is especially true in a time of economic hardship.

But the need for judicial sensitivity to these concerns does not justify abdication of judicial responsibility. Here, Congress—and not any court—created requirements it thought essential to protect the welfare of foster children. The Commonwealth voluntarily undertook to fulfill those requirements as a condition of receiving federal money. Plaintiffs filed suit to enforce those requirements because they believed it would serve their best interests to do so. They were aware that the final result might be a loss of federal funding by the Commonwealth. In the face of that knowledge, they chose to continue with this action. In granting preliminary relief to plaintiffs, this court does not substitute its judgment for that of state officials. It instead gives realization to the will of Congress and protection requested by those Congress intended to protect. Indeed, if the court chose to deny relief on the grounds urged by defendants, that denial would reflect a judgment that the wisdom of Congress and desires of plaintiffs should

go unheeded because the Commonwealth knows better than any of them how to serve plaintiffs' interests. This court is not free to make such a judgment.

Accordingly, I conclude that the threat of irreparable injury to plaintiffs outweighs any burden imposed on the state as a result of the granting of preliminary relief.

### D. The Public Interest

The final factor the court must consider is whether the public interest would be adversely affected by the granting of plaintiffs' motion for preliminary injunction.

No one would dispute that our society has an interest in ensuring proper care for its children. Here, however, both plaintiffs and defendants claim to represent the public interest. Both contend that the societal interest in protecting children from harm would best be served by a ruling in their favor.

For reasons similar to those stated in the discussion of the balance of harms, *supra,* I conclude that granting relief designed to secure the Commonwealth's compliance with requirements of federal law will not adversely affect the public interest. Congress imposed these requirements in the belief that they were essential to assure the proper care of children in the foster care system. The evidence confirms that failure to satisfy the Congressional conditions may result in grave harm to foster children. Guided by the Congressional determination of the public interest in this context, I conclude that the public interest will be furthered by awarding a remedy calculated to ensure that Massachusetts' foster care system conforms to the dictates of the Social Security Act.

### IV.

### *The Remedy for Non-Compliance with 42 U.S.C. § 608*

### A. Effect of the 1980 Act

Had this case been adjudicated before June 17, 1980, the effective date of the 1980 Act, the court would be called upon to devise a remedy designed merely to secure compliance with the requirements of 42 U.S.C. § 608(f). Because of the amendments affected by the 1980 Act, however, the task of fashioning appropriate equitable relief has become more complicated.

The 1980 Act replaces the Title IV–A AFDC–FC program with a new Title IV–E AFDC–FC program, codified at 42 U.S.C. §§ 671 *et seq.* Title IV–E applies to the same group of children previously covered by Title IV–A. *Compare* 42 U.S.C. § 608(a) *with* 42 U.S.C. § 672(a). Under section 101(a)(2) of the 1980 Act, states were permitted to begin operating under the new Title IV–E program as early as October 1, 1980, and will be required to make the transition to IV–E (if they are to participate in the AFDC–FC program at all) by the quarter beginning on October 1, 1982, at which time Title IV–A is repealed. Thus, between September 30, 1980 and September 30, 1982, a state may operate under Title IV–A or Title IV–E, but not both. Currently, the Commonwealth is operating under Title IV–A. *See* Stipulation, July 14, 1982. It is therefore appropriate to adjudicate Massachusetts' compliance with federal law under the requirements of section 608(f) of Title IV–A, as the court does here, because the provisions of Title IV–E do not become applicable until the state has in effect a plan approved under Title IV–E. It does not follow, however, that section 608(f) supplies the basis for the most appropriate remedy to secure Massachusetts' compliance with its future obligations, under federal law, to AFDC–FC children.

The parties have stipulated that DSS is now preparing a Title IV–E plan for submission to HHS. Once submitted, HHS must approve or disapprove the plan within 45 days. If the plan is approved by HHS, DSS will be entitled to receive Title IV–E funds retroactive to the first day of the quarter in which the Title IV–E plan is submitted. DSS intends to submit a Title IV–E plan to HHS by September 30, 1982. After the plan is submitted, DSS will be eligible and plans to apply for Title IV–E funds retroactive to July 1, 1982. Stipulation, July 14, 1982. In short, within a mat-

ter of days, the Commonwealth's duties toward AFDC–FC children will be governed not by Title IV–A but by the new Title IV–E.

Many of the provisions of Title IV–A find close parallels in Title IV–E. 47 Fed.Reg. 30,932 (July 15, 1982). In enacting Title IV–E, Congress intended to incorporate and give content to provisions of Title IV–A that had proved to be too generalized adequately to protect children from simply drifting in the foster care system with little or no hope of obtaining a permanent home. *See, e.g.,* 126 Cong.Rec. S6941 (daily ed. June 13, 1980) (statement of Senator Cranston) ("[S]ome of the most important aspects of this legislation relate to provisions strengthening the supervision and case planning for children in foster care. Current law contains a very generalized requirement that a case plan be developed for each child in foster care and that there be periodic review of the necessity for the child's being in foster care. One of the most serious and well-documented problems with our existing foster care system is the tendency for a child to become lost in the foster care system, with no efforts made to return the child home or to free the child for adoption if a return home is not feasible"). The case plan and periodic review requirements of section 608(f) of Title IV–A find analogues in section 671(a)(16) and section 675(1), (5)(B) of Title IV–E.

Section 671(a)(16) of Title IV–E provides that

    (a) In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

    \*     \*     \*     \*     \*     \*

    (16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements of section 675(5)(B) of this title with respect to each such child.

42 U.S.C. § 675(1) defines the mandated "case plan" as

    ... a written document which includes at least the following: A description of the type of home or institution in which a child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title; and a plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.

Section 675(5)(B) defines the case review system required under section 671(a)(16) as follows:

    (5) ... a procedure for assuring that—

    (B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship ...

Administrative review, under section 675(6),

    ... means a review open to the participation of the parents of the child, conducted by a panel of appropriate persons at least one of whom is not responsible for the case management of, or the delivery of services to, either the child or the parents who are the subject of the review.

Both the plain language of these Title IV–E provisions and the legislative history

of their enactment reveal that sections 671(a)(16) and 675(1), (5)(B) continue and strengthen the case plan and periodic review requirements of section 608(f). *See, e.g.,* 126 Cong.Rec. H4981 (daily ed. June 13, 1980) (summary of provisions of conference agreement on H.R. 3434) ("The present Title IV–A AFDC Foster Care program would be shifted to a new Title IV–E. Foster care assistance would continue to be a required program as under current law"); 126 Cong.Rec. S6941 (daily ed. June 13, 1980) (statement of Senator Cranston) ("[T]he conference agreement adopted the Senate provision which would establish a new part E of Title IV of the Social Security Act—transferring the existing foster care maintenance program from Title IV–A to the new Title IV–E and creating in the new title an adoption assistance program for children with special needs . . . [S]ome of the most important aspects of this legislation relate to provisions strengthening the supervision and case planning for children in foster care"); 125 Cong.Rec. S15290 (daily ed. Oct. 29, 1979) (discussion of Senate version of H.R. 3434 by Senator Cranston) ("The legislation as reported would strengthen the provisions in existing law by describing exactly what factors should be covered in the case plan").

Thus, proof of violation of the generalized case plan and periodic review requirements of section 608(f) also constitutes proof of violation of the more stringent, detailed requirements for case plans and case review set forth in sections 671(a)(16) and 675(1), (5)(B). Plaintiffs have exhibited a likelihood of success on their claims under section 608(f). Since DSS is not now complying with section 608(f), it would take nothing short of a miracle for the Department to come into compliance with sections 671(a)(16) and 675(1), (5)(B) by October 1, 1982, when those provisions become applicable. In spite of improvements by DSS, the evidence does not warrant a finding that such a miracle will occur.

In these circumstances, I conclude that the most appropriate relief in this case is forward-reaching relief designed to secure the Department's compliance with sections 671(a)(16) and 675(1), (5)(B) of Title IV–E, in the event that the Commonwealth submits and obtains Secretarial approval of a IV–E plan. Very shortly, the repeal of the Title IV–A program will be effective. Under *Edelman v. Jordan,* " . . . a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief . . . and may not include a retroactive award which requires the payment of funds from the state treasury . . . ." 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974). And yet, it is evident that issuing prospective relief based on Title IV–A would serve little purpose, and, indeed, would thwart Congressional intent in enacting the amendments effected by Title IV–E. Congress intended that Title IV–A be replaced with IV–E as of October 1, 1982 at the latest. That Congressional purpose can be fulfilled most effectively by this court's issuing prospective relief based on sections 671(a)(16) and 675(1), (5)(B) of Title IV–E, to be imposed if and when the Commonwealth begins operation under the Title IV–E program. Of course, if the state does not submit a IV–E plan, it will receive no federal funds and will be relieved of the obligation to comply with the requirements of Title IV–E.

■ This court has jurisdiction to fashion appropriate relief, *see Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970), designed to secure compliance with the provisions of 42 U.S.C. §§ 671(a)(16), 675(1), (5)(B). For the reasons stated below, I conclude that plaintiffs would be entitled to enforce rights created by those provisions in a separate action under 42 U.S.C. § 1983. From this it follows that the court may enforce those provisions in this action, as soon as they become applicable to the Commonwealth by reason of DSS's submission of a Title IV–E plan approved by the Secretary.

*Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) teaches that, in order to serve as a basis of a claim for relief under 42 U.S.C. § 1983, a provision of a federal

statute establishing a scheme of cooperative federalism must (1) have been intended by Congress to impose "an obligation on the States to spend money to fund certain rights as a condition of receiving federal moneys...," *id.* at 18, 101 S.Ct. at 1540; and (2) give rise to "a private cause of action to compel state compliance with [the statutory] conditions," *id.* at 27–28, 101 S.Ct. at 1545.

First, the plain language and the legislative history of section 671(a)(16) indicates that Congress intended to impose on the states, as a condition of receipt of federal IV–E funds, an obligation to provide each AFDC–FC child a case plan meeting the criteria of section 675(1) and a case review fulfilling the requirements of section 675(5)(B). Second, I conclude, for the reasons summarized here and stated more fully in the June 9, 1981 Memorandum and Order, that section 671(a)(16) supports a private right of action to enforce the case plan and case review requirements contained therein. A long line of precedent supports plaintiffs' right, as the beneficiaries of these services, to secure state compliance with provisions of the Social Security Act. *See Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Maine v. Thiboutot,* 448 U.S. 1, 5–6, 100 S.Ct. 2502, 2505, 65 L.Ed.2d 555 (1979) (collecting cases). Moreover, in *Rosado v. Wyman, supra,* the Supreme Court

> rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the states in view of the fact that Congress has lodged in the Department of [HHS] the power to cut off federal funds for noncompliance with statutory requirements.

397 U.S. at 420, 90 S.Ct. at 1221. On this authority, I conclude that Title IV–E, *see* 42 U.S.C. § 671(b), does not provide "an exclusive remedy for violations of [its terms]." *Pennhurst, supra,* at 28, 101 S.Ct. at 1545, quoting *Maine v. Thiboutot, supra,* 448 U.S. at 22 n. 11, 100 S.Ct. at 2513 n. 11 (Powell, J., dissenting). Accordingly, the court may provide the remedy for violations of section 608(f)—and, consequently, sections 671(a)(16) and 675(1), (5)(B)—discussed below.

**B. Requirements for Compliance with Federal Law**

In *Rosado v. Wyman, supra,* the Supreme Court considered what form of relief is appropriate when a state fails to comply with a federally imposed condition on state participation in a cooperative federalism program. The Court held that, in such circumstances, plaintiffs "are entitled to declaratory relief and an appropriate injunction by the District Court against the payment of *federal* monies ... should the State not develop a conforming plan within a reasonable period of time." 397 U.S. at 420, 90 S.Ct. at 1221 (emphasis in original). The Court remanded "the case to the District Court to fix a date that will afford [the state] an opportunity to revise its program in accordance with the requirements of [the Social Security Act] if the State wishes to do so." *Id.* at 421, 90 S.Ct. at 1222. The district court was directed to "retain jurisdiction to review ... any revised program adopted by the State, or should [the state] choose not to submit a revamped program by the determined date, issue its order restraining the further use of federal monies pursuant to the ... statute." *Id.* at 421–22, 90 S.Ct. at 1222.

The requirements imposed on the Commonwealth by 42 U.S.C. §§ 671(a)(16) and 675(1), (5)(B) are spelled out rather clearly in sections 675(1), (5)(B). For the sake of clarity, they are enumerated in the order accompanying this opinion.

Three issues regarding the scope of the Commonwealth's obligations under the statute must be addressed in this opinion. First, plaintiffs contend that one of the obligations imposed on the Commonwealth under 42 U.S.C. §§ 671(a)(16), 675(1) is a duty to provide services to facilitate the child's return home or otherwise make possible the child's permanent placement. Plaintiffs argue that these obligations exist under section 608(f) of Title IV–A and are continued under the analogous provisions of Title IV–E. There is support for plaintiffs'

contention that these services are required under section 608(f). *See, e.g., Miller v. Yoakim,* 440 U.S. 125, 137, 141, 99 S.Ct. 957, 965, 967, 59 L.Ed.2d 194 (1979) ("section 608(f)(1) of the Act obligates states to ensure that *services* are provided which are designed to improve the conditions in the home from which [the foster child] was removed or to otherwise make possible his being placed in the home of a relative...") ("Section 408 embodies Congress' recognition of the peculiar status of neglected children in requiring that States work to improve the conditions in the foster child's original home or to transfer him to a relative when feasible, [§ 608(f)(1)]...") (emphasis added); 126 Cong.Rec. S6942 (daily ed. June 13, 1980) (statement of Senator Cranston) (... [C]urrent law [42 U.S.C. § 608(f)(1)] requires that a child in foster care receive proper care and *services* designed to improve the conditions in the home from which he was removed or otherwise make possible his being placed in the home of a relative. These very generalized provisions have had little specific impact upon a State's responsibility to provide services designed to prevent a child's removal from his or her home, or to help alleviate the problem which caused the child's removal in the first place.... [S]ome courts have specifically held that social services agencies had no affirmative duty to provide preventive services to a

distressed family before the removal of a child") (emphasis added).

Even if such a duty exists under section 608(f), however, whether it is continued under sections 671(a)(16), 675(1) of Title IV–E is a more debatable proposition. Section 671(a)(15) of the new statute requires that

effective October 1, 1983, [the state shall have a plan approved by the Secretary which] provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home; ...

Thus, it appears that, if a duty to provide reunification services exists under Title IV–A, Congress—perhaps in recognition of the widespread failure of the states to meet this obligation—decided to allow the states some time in which to redesign their programs before imposing that duty as a condition of receiving federal funds under Title IV–E. There is nothing in the legislative history, or the Secretary's recently proposed rules to implement the Title IV–E AFDC–FC program, see 47 Fed.Reg. 30932–43 (July 15, 1982), to suggest the contrary. Accordingly, the court will not now hold DSS responsible, under Title IV–E,[10] for actually providing services designed to improve the conditions in the home from which a foster child was removed, pursuant to a judicial determination,[11] so as to facilitate the

---

**10.** 42 U.S.C. § 627(a)(2)(C), part of Title IV–B of the Social Security Act, provides that

(a) If, for any fiscal year after fiscal year 1979, there is appropriated under section 620 of this title a sum in excess of $141,000,000, a State shall not be eligible for payment from its allotment in an amount greater than the amount for which it would be eligible if such appropriation were equal to $141,000,000, unless such State—

\* \* \* \* \* \*

(2) has implemented and is operating to the satisfaction of the Secretary—...

(C) a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship. Nothing in this memorandum is intended to limit the scope of or relieve defendants of any obligations the Commonwealth might have, under 42 U.S.C. § 627(a)(2)(C) or any other provi-

sion apart from 42 U.S.C. § 671(a)(16), to provide services designed to reunite children in foster care with the families from whose homes they were originally removed.

**11.** 42 U.S.C. § 672(d) provides that a state may receive federal IV–E funds for amounts expended for foster care maintenance payments for children removed from their homes pursuant to *voluntary placement agreements,* only if, at the time such amounts were expended, the state has fulfilled all the requirements of 42 U.S.C. § 627. As noted above, *see* note 10 *supra,* section 627(a)(2)(C) requires that the state implement and operate "a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship." In addition, section 627(b)(3) requires that a state "[implement] a preplacement preventive service program designed to help children remain with their families."

child's return home. After October 1, 1983, the Department will be required to fulfill this obligation in order to receive federal funds under Title IV–E.

The second issue the court must address is the problem created by the unmanageable caseloads of DSS social workers. It would be difficult, on the evidence submitted, to pinpoint an average number of cases currently being carried by DSS social workers. *Compare, e.g.,* Ex. 22–Q–6 (reflecting a department-wide ratio of 1 worker to 21.4 cases as of December, 1981) *with* Ex. 13 (indicating, as of May, 1981, a department-wide ratio of 1 worker to 33.5 cases, including cases involving out-of-home placements). One thing is clear, however. Social worker after social worker testified that their caseloads are too heavy to afford them time to engage in planning and review of their cases—indeed, too heavy to allow them to do almost anything but respond to emergencies. The evidence is overwhelming that the existence of high caseloads is a predominant factor preventing DSS employees from fulfilling their responsibilities under federal law.

Congress recognized that the existence of unmanageable caseloads was responsible for many of the problems for which the 1980 Act is an intended cure. Senator Cranston, discussing the need for reform in a floor debate of the Senate version of the bill that became the 1980 Act, quoted from the following 1975 report of the Subcommittee on Children and Youth of the Labor and Public Welfare Committee:

> Because of the *large caseloads* and rapid turnover rates among case workers, some children in foster care "get lost." The word "lost" may seem a little dramatic, but it is appropriate. *Given the pressures of a large caseload,* the social worker usually has to concentrate on the clients that present immediate problems. As a result, the social worker often loses track of the nonproblem child, is unaware of that child's needs, and develops no

goals and provides no active services for the child or his family.

125 Cong.Rec. S15289 (daily ed. Oct. 29, 1979) (emphasis added). *See also* 125 Cong. Rec. H7097 (daily ed. Aug. 2, 1979) (statement of Congressman Rostenkowski) ("... *[B]ecause of the heavy caseloads of the case workers,* many children are placed in homes that do not provide proper care or a proper environment for the child".) (emphasis added).

■ For these reasons, I conclude that it is appropriate to set standards for the numbers of cases that may be carried by DSS social workers. The evidence shows that it is necessary to do so in order to aid the Department in achieving prospective compliance with the requirements of Title IV–E detailed above. I will therefore order that the Department may not assign to its social workers a number of cases that is greater than the number of cases that workers are able to carry and simultaneously fulfill their obligations to provide case plans and periodic review (as defined in 42 U.S.C. § 675(1), (5)(B)) in their cases. In determining the Department's compliance with this requirement, I will use the following guidelines:

(1) The Department's establishment and maintenance of an average ratio, in each DSS area, of twenty "generic" or "mixed" cases per caseworker will be taken as a rebuttable presumption that the Department is assigning to its social workers only the number of cases that workers are able to carry consistent with fulfilling their obligations, as outlined in the order accompanying this opinion, under 42 U.S.C. §§ 671(a)(16), 675(1), (5)(B).

(2) Only Social Workers I and II may be counted in computing the 1:20 ratio established in (1) above.

Evidence was presented that supports the proposition that a caseworker may carry an average caseload of twenty "generic" cases

---

These provisions are not at issue in this action. Therefore, I do not consider them or include them as subjects of the remedy. Failure to consider these provisions or address

them in the relief granted, however, is not intended to limit the scope of or relieve defendants of any obligations imposed on the Commonwealth by these provisions.

consistent with applicable legal require-ments. *See, e.g.,* Ex. 11, at III–54; Ex. 51, at 3, Criterion 2; Affidavit of Mary Jane England, ¶ 96; Tr. 5/5/82, at 215. It is evident, however, that a caseworker cannot handle twenty of certain types of cases— *e.g.,* "assessment" cases—and fulfill his or her obligations. Therefore, the presump-tive guideline of an average caseload of twenty cases will not be an appropriate measure of caseloads of certain types of cases. The presumptive guideline is intend-ed only as a standard against which to measure the Department's compliance with the court's order. It is not a hard and fast rule. After the Department places in oper-ation a revised program in conformity with the court's order (in the event that the Department chooses to do so), if plaintiffs demonstrate that the Department is not able to comply with its obligations under 42 U.S.C. §§ 671(a)(16) and 675(1), (5)(B) by maintaining an area-wide average ratio of one worker to twenty "generic" cases, the presumption stated above will be rebutted. Conversely, the presumption may be rebut-ted by the Department if it proves that compliance can be achieved with a higher area-wide average ratio.

The final issue that must be considered is the problem of "unassigned" cases. From July, 1980 through January, 1981, DSS col-lected information from each area office on the number of DSS "assigned" cases and the number of DSS cases "pending assign-ment." For the purpose of collecting such information, DSS employed the following definitions:

*Assigned:* Direct service social worker is currently responsible for the request, referral, or case.

*Pending Assignment:* Request, refer-ral, or case is currently awaiting assign-ment to a direct service social worker. Include here any requests, referrals, or cases which are currently the responsibili-ty of supervisory or administrative staff. Ex. 16.

The evidence supports a finding that, from July, 1980 through January, 1981, the Department had scores of cases "pending

assignment"—meaning that no direct ser-vice social worker was responsible for them. In February, 1981, DSS discontinued collec-ting data on the number of cases "assigned" and "pending assignment." The discontin-uance was effected by formal elimination, in the Unduplicated Monthly Case Counts kept by the Department, of the category of cases "pending assignment." This formal elimination of the tally of cases "pending assignment" did not succeed in correcting the problem of having cases to which no direct services social worker is assigned. The evidence confirms that significant numbers of such cases still exist within DSS. *See, e.g.,* Ex. 21–P–6; Tr. 8/13/81, at 23; Tr. 8/31/81, at 86; Affidavit of Donna Boyd, at 3; Affidavit of Roberta Caulfield, at 1–2; Affidavit of Barbara Headrick. It is evident that when a case is not assigned to a social worker directly responsible for servicing the case, the case planning and periodic review mandated by Title IV–E will not be provided. Permitting cases to simply float around the office, or to pile up on the desk of a supervisor who is not responsible for servicing them, is conducive to the "foster care drift" that Congress intended to protect against in enacting the 1980 Act. Senator Cranston, in urging the adoption of the Senate version of H.R. 3434, quoted the following from a 1975 report by the Subcommittee on Children and Youth of the Labor and Public Welfare Committee:

... Many ... children drift in foster care, either *because no worker is assigned to them,* or because the worker is new to the job and has not gotten to each child's case yet.

125 Cong.Rec. S15289 (daily ed. Oct. 29, 1979) (emphasis added).

■ Accordingly, I conclude that, for the purpose of ensuring that DSS complies with the requirements of 42 U.S.C. §§ 671(a)(16), 675(1), (5)(B), it is appropriate to enter the following order, as part of the relief grant-ed:

(1) DSS, within 24 hours of receipt of a case by DSS, shall assign it to a Social Worker I or II—or to a supervisory Social Worker III who chooses to act as a direct

service social worker in such cases and can do so consistently with performing his or her obligations, as outlined in [I.]A. and B. of [the order accompanying this opinion], to provide case plans and periodic review.

(2) A case record shall not be considered "assigned" until any existing case record has been delivered to the assigned social worker.

The requirements set forth in the accompanying order and stated above detail the Commonwealth's prospective obligations, and the corresponding rights secured plaintiffs, under the Title IV–E program. As noted above, if the Commonwealth is to continue to participate in the AFDC–FC program after September 30, 1982, DSS must submit a Title IV–E plan, by that date, for approval by the Secretary. For the purpose of granting forward-reaching relief for the violations of the AFDC–FC program found herein, defendants are ordered to notify the court, within seven days of the Department's submission of a Title IV–E plan to the Secretary, if the Commonwealth files such a plan; or to notify the court, within seven days, of a decision by the Department not to submit a Title IV–E plan, if the Commonwealth so decides. If the Department does submit a Title IV–E plan to the Secretary, defendants are ordered to file with the court, within 60 days of submission of the plan, a written report demonstrating that the Commonwealth's AFDC–FC program is in conformity with the requirements of Title IV–E outlined above.[12] If defendants choose not to submit such a revised program, or fail to submit it within the time allowed, they will be restrained from spending any federal monies under the Title IV–E program. In addition, if defendants choose not to submit such a revised program, plaintiffs may apply to the court for a hearing on their claims under the due process clause of the Fourteenth Amendment.

V.

*Claims Under Title IV–B*

A.   Likelihood of Success on the Merits

■   Plaintiffs claim under 45 C.F.R. § 1392.40(b)(3). In the Memorandum and Order of June 9, 1981, this court concluded that plaintiffs may enforce rights secured under 45 C.F.R. § 1392.40(b)(3) in an action under 42 U.S.C. § 1983. A premise of the court's reasoning in that memorandum and order, however, was that 45 C.F.R. § 1392.-40(b)(3) was promulgated under Title IV–A and applies to the states' programs under Title IV–A. *See* June 9, 1981 Memorandum and Order, at 17. Having reconsidered the matter, I now conclude that that premise was faulty. 45 C.F.R. § 1392.40(b)(3) falls within the section of 45 C.F.R. Part 1392 entitled "Mandatory Services Applicable to Title IV, Part B." The regulation does not appear in any sections designated as applicable to Title IV–A. For this reason, I conclude that 45 C.F.R. § 1392.40(b)(3) applies only to state programs operated under Title IV–B of the Social Security Act, codified at 42 U.S.C. §§ 621 *et seq.* Accordingly, before I could appropriately conclude that section 1392.40(b)(3) creates rights enforceable in an action under 42 U.S.C. § 1983, I would have to conclude that one or more provisions in Title IV–B, supporting the regulation, create such rights. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 577 n. 18, 99 S.Ct. 2479, 2489 n. 18, 61 L.Ed.2d 82 (1979) (rejecting the proposition that rules and regulations promulgated pursuant to a statute may create private rights of action where the statute itself does not). This has not been done.

For the reasons stated below, however, I will disregard plaintiffs' claims under 45 C.F.R. § 1392.40(b)(3) and decide only plaintiffs' claims under a provision of Title IV–B

---

**12.** The Secretary must approve or disapprove the Department's Title IV–E plan within 45 days of submission of the plan. If the Department submits a IV–E plan, and the plan is subsequently disapproved by the Secretary, DSS shall notify this court, within seven days, of such disapproval. In that event, the Department will not be eligible for Title IV–E funds and will therefore be relieved of the obligation to submit a revised program in accordance with this opinion and accompanying order.

containing requirements analogous to those stated in the regulation. 45 C.F.R. § 1392.-40(b)(3) requires that a state's Title IV–B plan provide that

> [t]here will be a case plan, including diagnostic evaluation and plan for treatment, when a child is accepted for child welfare services; and periodic review of such plan.

45 C.F.R. § 1392.40(b)(3) predates the 1980 Act, which substantially amended Title IV–B. At the time plaintiffs filed their complaint, Title IV–B contained no provisions for case plans and periodic review. Today, as a result of the amendments effected by the 1980 Act, Title IV–B expressly mandates that, under certain conditions met here, the states must implement detailed requirements for case plans and case review. *See text* of 42 U.S.C. § 627(a)(2)(B) at pp. 349–350 *infra.* These requirements are more specific and more stringent than those contained in 45 C.F.R. § 1392.-40(b)(3). The Congressional purpose in amending Title IV–B to include these strengthened case plan and case review requirements should be given effect by the court. Moreover, in the notice of proposed rulemaking promulgated by the Secretary on July 15, 1982, the Secretary has proposed rules implementing the case plan and review requirements of the amended statute and has indicated an intention to remove Part 1392, including 45 C.F.R. § 1392.-40(b)(3), from the Code of Federal Regulations. 47 Fed.Reg. 30939 (July 15, 1982). Therefore, the authority for any order under 45 C.F.R. § 1392.40(b)(3) is likely to be eliminated soon. In these circumstances, it would make little sense to adjudicate plaintiffs' claims and provide relief under 45 C.F.R. § 1392.40(b)(3). 42 U.S.C. § 627(a)(2)(B), in which the case plan and periodic review requirements of Title IV–B appear, currently applies to the Commonwealth.[13] The court will adjudicate claims to entitlements under this statute, and plaintiffs have not shown a likelihood that they will be harmed by the court's disregarding their claims to case plans and periodic review under the regulation.[14] Nor are defendants treated unfairly. They are charged with knowledge of applicable federal law. The issues and evidence relevant to the regulation are the same as those relevant to certain analogous requirements of 42 U.S.C. § 627(a)(2)(B). And, as noted earlier in this opinion, the court explicitly raised with the parties, before the close of the evidence in the hearings on plaintiffs' motion for preliminary injunction, issues relating to the availability of relief under Title IV–B. *See note 5 supra.* I therefore find that claims under requirements of 42 U.S.C. § 627(a)(2)(B) analogous to those found in 45 C.F.R. § 1392.40(b)(3) were

**13.** As explained more fully below, the requirements of section 627(a)(2)(B) apply, in a fiscal year in which Congress appropriates more than $141,000,000 under Title IV–B, to a state opting to receive an amount greater than it would be entitled to receive were the amount appropriated $141,000,000.

The parties have stipulated that for each of the federal fiscal years 1981 and 1982, Congress has appropriated, under section 620 of Title IV–B, a sum in excess of $141,000,000. The parties have stipulated also that the Commonwealth received in 1981 and has been receiving in 1982 supplemental allotments of Title IV–B funds in excess of what it would have received if the total appropriation by Congress were only $141,000,000. *Stipulation,* July 14, 1982.

**14.** It may be that a broader subgroup of plaintiffs would be entitled to claim the protections of 45 C.F.R. § 1392.40(b)(3) than the subgroup covered by 42 U.S.C. § 627(a)(2)(B). 45 C.F.R. § 1392.40(b)(3), on its face, applies to all children "accepted for child welfare services." 42 U.S.C. § 627(a)(2)(B), on the other hand, applies to all children in foster care under the state's supervision, as explained more fully below.

As stated above, however, the Secretary has proposed to remove 45 C.F.R. § 1392.40(b)(3) from the Code of Federal Regulations. 47 Fed. Reg. 30939 (July 15, 1982). The new regulations proposed by the Secretary to implement Title IV–B do not extend the case plan and case review protections to any children other than children in foster care under the state's supervision. In these circumstances, I conclude that it would not be appropriate to enforce 45 C.F.R. § 1392.40(b)(3), insofar as it requires case plans and periodic review for children not in foster care. A regulation likely to be removed from the books is too slender a reed on which to base preliminary relief of the kind sought by plaintiffs.

tried with the knowledge and "implied consent" of defendants, Fed.R.Civ.P. 15(b), and conclude that it is appropriate to treat plaintiffs' claims under these parallel requirements of 42 U.S.C. § 627(a)(2)(B) as having been raised in plaintiffs' complaint. The analogous requirements· are those contained in section 675(5)(A), (B) of Title IV–E, incorporated by reference into section 627(a)(2)(B) of Title IV–B.[15]

I now proceed to consider (1) whether 42 U.S.C. § 627(a)(2)(B) (as supplemented by 42 U.S.C. § 675(5)(A), (B) incorporated therein, creates rights enforceable in this action under 42 U.S.C. § 1983; and (2) whether plaintiffs have proved violations of those rights sufficient to warrant preliminary relief.

1. Rights Created by 42 U.S.C. § 627(a)(2)(B)

As stated in part IV.A, *supra,* the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman* contains the standards governing whether a private party can obtain judicial relief, in an action under 42 U.S.C. § 1983, for a state's failure to comply with provisions of a statute establishing a program of cooperative federalism. The relevant inquiries in this case are (1) whether Congress in 42 U.S.C. § 627(a)(2)(B) imposed an obligation on the states to fund rights secured therein as a condition of receiving federal funds

under Title IV–B, 451 U.S. at 18, 101 S.Ct. at 1540; and (2) if so, whether section 627(a)(2)(B) gives rise to "a private cause of action to compel state compliance with [the statutory] conditions," 451 U.S. at 27–28, 101 S.Ct. at 1545.

As defendants point out, parts of Title IV–B appear to be intended to encourage the states, in cooperation with the Secretary of HHS, to establish and extend the provision of social services calculated to ensure permanent and proper homes for children. 42 U.S.C. § 622(a), for example, provides for joint development, by the Secretary and the relevant state agencies, of the states' Title IV–B plans. It may be that certain provisions of Title IV–B do not impose obligations on the states, but rather "[speak] merely in precatory terms." 451 U.S. at 18, 101 S.Ct. at 1540. *Pennhurst* also instructs, however, that, in determining whether a statute creates conditions with which states must comply to receive federal funds, a court must analyze discrete provisions separately.

42 U.S.C. § 627(a)(2)(B) provides as follows:

(a) If, for any fiscal year after fiscal year 1979, there is appropriated under section 620 of this title a sum in excess of $141,000,000, a State shall not be eligible for payment from its allotment in an amount greater than the amount for which it would be eligible if such appro-

---

**15.** 45 C.F.R. § 1392.40(b)(3) requires a case plan and periodic review. The only content prescribed for the required case plan is that it include "diagnostic evaluation and plan for treatment." *See* text of 45 C.F.R. § 1392.-40(b)(3) *supra.*

42 U.S.C. § 627(a)(2)(C) requires implementation and operation of a case review system, as defined in 42 U.S.C. § 675(5), for each child in foster care under the state's supervision. 42 U.S.C. § 675(5)(A) describes part of what the case plan, which is the foundation of the case review system, must address. Therefore, the requirement set forth in section 675(5)(A) parallels the case plan requirement of 45 C.F.R. § 1392.40(b)(3), because both speak to the content or focus of the case plan. Similarly, the requirements set forth in section 675(5)(B) parallel the periodic review requirement of 45 C.F.R. § 1392.40(b)(3), as the former merely gives specificity to the latter.

The requirements set forth in section 675(5)(C), although included in the definition of the mandated "case review system," are farther afield from the original concept of periodic review embodied in the regulation. The court received no evidence regarding whether the Commonwealth requires the dispositional hearings and other procedural safeguards specified in section 675(5)(C), or whether the Department complies with any such requirements. Accordingly, plaintiffs' claim under 45 C.F.R. § 1392.40(b)(3) will not be treated as raising a claim under 42 U.S.C. § 627(a)(2)(B) insofar as the latter incorporates the requirements of section 675(5)(C). The evidence does not warrant a finding that issues and claims under section 675(5)(C), or any requirements of section 627 other than those stated above, were tried with the implied consent of the defendants.

priation were equal to $141,000,000, unless such State—

\* \* \* \* \* \*

(2) has implemented and is operating to the satisfaction of the Secretary—. . .

(B) a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision of the State; . . .

Whether or not Congress intended only to set goals for the states in other provisions of Title IV–B, it is clear that in section 627(a)(2)(B), Congress imposed the case review requirements of section 675(5) as a condition to the states' receipt of federal funds, in certain circumstances. Those circumstances are that, in any fiscal year in which Congress appropriates more than $141,000,000 in Title IV–B funds, a state cannot receive more than the amount it would receive were the appropriation only $141,000,000, unless the state has in operation a case review system meeting the requirements of section 675(5). The language of the statute makes this clear. The statute is couched in obligatory terms: "a state *shall not be eligible* . . ., unless such State . . ." 42 U.S.C. § 627(a). The only possible limiting language of the statute is the clause "has implemented and is operating *to the satisfaction of the Secretary.*" *Id.* at § 627(a)(2). But this language is relevant, if at all, to the question whether Congress intended an exclusive remedy to lie with the Secretary. *See* pp. 351–352 *infra.* It cannot be read to limit the existence or scope of the obligation imposed on the states. To interpret the phrase "to the satisfaction of the Secretary" as transforming an otherwise clear obligation to comply with the requirements of section 675(5) into a mere duty to achieve whatever degree of conformity with those requirements is needed to satisfy the Secretary would be contrary to the Congressional purpose. The legislative history of enactment of section 627(a)(2)(B) makes clear that Congress meant to condition the receipt of supplemental funds on compliance with the requirements of section 675(5). *See, e.g.,* 126 Cong.Rec. H4980–81 (daily ed. June 13,

1980) (summary of provisions of conference agreement on H.R. 3434) ("In any year in which Title IV–B appropriations exceed $141 million, a State *could not receive* any IV–B funds in excess of its share of $141 million *unless* it had implemented . . . a case review system for each child in foster care . . .") (emphasis added); 126 Cong.Rec. S6944 (daily ed. June 13, 1980) (description by Senator Cranston of terms of Section 627). *See also* 47 Fed.Reg. 30937 (July 15, 1982) (Secretary's description of requirements of section 627(a)). Accordingly, I conclude that 42 U.S.C. § 627(a)(2)(B) imposes an obligation on the state to fulfill the requirements of section 675(5), as a condition to receiving Title IV–B funds in excess of its proportionate share of $141,000,000.

■ The next issue that must be addressed is whether section 627(a)(2)(B) creates a private right of action to compel the state's compliance with the terms of section 675(5). ". . . *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), held that suits in federal court under [42 U.S.C.] § 1983 are proper to ensure compliance with the provisions of the Social Security Act on the part of participating States." *Edelman v. Jordan,* 415 U.S. 651, 675, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (footnote omitted). This result was reaffirmed in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

In *Thiboutot,* the Supreme Court, holding that 42 U.S.C. § 1983 provides a cause of action for state deprivations of rights secured by laws of the United States, explicitly recognized the availability of a private right of action under section 1983 to redress violations of the Social Security Act. *See id.* at 5–6, 100 S.Ct. at 2505 (collecting Social Security Act cases in which section 1983 was "necessarily the exclusive statutory cause of action"). Plaintiffs in foster care are clearly within the class of beneficiaries Congress intended to protect in mandating that the case review requirements of section 675(5) be met. The case review requirements are clearly defined. Unlike many statutory directives involving exer-

cise of discretion for which specific expertise may be required, the case review requirements are sufficiently concrete to be readily capable of enforcement by this court. In short, there is nothing to distinguish them from the "right[s] secured" by other Social Security Act provisions held enforceable in suits under section 1983. I therefore conclude that the case review requirements dictated by 42 U.S.C. § 627(a)(2)(B) are "rights secured" by the Social Security Act within the meaning of 42 U.S.C. § 1983. *See Pennhurst, supra,* 451 U.S. at 28, 101 S.Ct. at 1545.

One final issue must be considered. A year after the decision in *Thiboutot,* the Supreme Court suggested an exception to the holding of *Thiboutot* where the "governing statute provides an exclusive remedy for violations of [its terms]." *Pennhurst, supra,* 451 U.S. at 28, 101 S.Ct. at 1545, quoting *Maine v. Thiboutot, supra,* 448 U.S. at 22 n. 11, 100 S.Ct. at 2513 n. 11 (Powell, J., dissenting). Defendants contend that, taken together, section 623(b)(2) of Title IV–B, and the phrase "to the satisfaction of the Secretary" in section 627(a)(2) indicate a Congressional intention to lodge exclusive power in the Secretary to secure compliance with the requirements of section 627(a)(2)(B). Though this argument has some appeal, the structure of the statute, existing precedent, and sound policy considerations lead to the conclusion that it must be rejected.

It is not clear that section 623(b) even supplies a remedy for a state's noncompliance with the requirements of section 627, let alone an exclusive remedy. Section 623(a), to which one must refer in construing section 623(b), directs the Secretary to distribute sums to states having plans developed in accordance with section 622. The distribution is "subject to the conditions set forth in this section and in section 627 of this title." 42 U.S.C. § 623(a). Section 623(b), specifying the method of computing and making payments to the states, directs the Secretary to estimate the amount to be paid to a state during a particular period and to pay the amount estimated, "reduced or increased, ... by

any sum ... by which [the Secretary] finds that his estimate of the amount to be paid the State for any prior period ... was greater or less than the amount which should have been paid to the State for such prior period." Reading the power of adjustment granted the Secretary in section 623(b) together with the qualifying clause in section 623(a), and with the reference in section 627(a)(2) to a case review system operating "to the satisfaction of the Secretary," may yield the conclusion that the Secretary has the power to reduce payments to a state if he finds the state in noncompliance with the requirements of section 627(a)(2)(B).

If the statute does give the Secretary the power to do so, its terms for conferring that authority are not nearly as clear as the terms of statutory provision referred to in *Pennhurst. See* 42 U.S.C. § 6065, cited in *Pennhurst, supra,* 451 U.S. at 28, 101 S.Ct. at 1545. Nor are they as explicit as the language of the provision at issue in *Rosado v. Wyman. See* 42 U.S.C. § 604(a), cited in *Rosado, supra,* 397 U.S. at 406 n. 8, 90 S.Ct. at 1214 n. 8. In that case, the Supreme Court

> rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements.

*Id.* at 420, 90 S.Ct. at 1221. The stated justification for that holding is equally applicable here. Absent a clearer expression of Congressional intent to "[close] the avenue of effective judicial review to those most directly affected by administration of [Title IV–B]," *id.,* I conclude that nothing in Title IV–B lodges with the Secretary the exclusive power to secure compliance with the requirements of section 627(a)(2)(B).

For these reasons, I conclude that plaintiffs may enforce the case review requirements of section 675(5), (A), (B), incorporated by reference in section 627(a)(2)(B), in this action under 42 U.S.C. § 1983.

352

The requirements of section 675(5)(A), (B) are relatively clear. Many of them have been discussed previously in this opinion. *See* parts IV.A., B., *supra*. However, a few matters warrant further discussion. First, there is the question whether the case plan requirements set forth in 42 U.S.C. § 675(1) must be met under section 627(a)(2)(B) of Title IV–B. Section 627(a)(2)(B) makes no explicit reference to section 675(1). It merely mandates a "case review system (as defined in section 675(5))." *See* text of 42 U.S.C. § 627(a)(2)(B), *supra*. But part of the definition of the "case review system" mandated by section 675(5) is "a procedure for assuring that—

(A) each child has a *case plan* designed to achieve placement in the least restrictive (most family-like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child[.]

42 U.S.C. § 675(5)(A) (emphasis added). In addition, the review required in section 675(5) must include a determination of "the extent of compliance with the *case plan*." 42 U.S.C. § 675(5)(B) (emphasis added). Thus, these provisions make explicit reference to review of the case plan. And section 675(1), defining the term "case plan," explicitly states that the definition applies wherever the term is "used in this part or part B of this subchapter." 42 U.S.C. § 675(1). Thus, the most natural reading of the plain language of section 675 is that section 675(5) incorporates the definition and requirements for a case plan set forth in section 675(1). This reading is consistent with—and indeed necessary to fulfill—the purposes of section 675(5). As observed in part III.A.1.(c) *supra*, the concepts of case plan and periodic review are integrally related. Accordingly, I conclude that to satisfy the requirements of 42 U.S.C. § 627(a)(2)(B), which incorporates the requirements of section 675(5), states must provide case plans meeting the definition stated in section 675(1).

Second, the scope of persons entitled to the protections of section 627(a)(2)(B) should be clarified. The provision requires that a case review system be instituted "for each child receiving foster care under the supervision of the State." 42 U.S.C. § 627(a)(2)(B). The provision, then, is unambiguous on its face. It does not purport to limit its protections to any particular subgroup of children in foster care. In particular, it does not exclude children in foster care under the AFDC–FC program. I therefore conclude that, in order to receive supplemental funds under section 627, the state must satisfy the requirements of section 627(a)(2)(B) for all children in foster care in the Commonwealth.

Third, for the reasons stated in part V.B *supra*, I conclude that 42 U.S.C. § 627(a)(2)(B), insofar as it incorporates the requirements of sections 675(1), (5)(A), (B), does not mandate that the state provide reunification services to foster children and their families. This ruling is not intended to limit the scope of or relieve the Commonwealth of any obligation to provide such services under provisions of Title IV–B or Title IV–E apart from 42 U.S.C. § 627(a)(2)(B) and other provisions explicitly considered here.[16]

## 2. Proof of Noncompliance

In part III.A.2. *supra*, I found that plaintiffs have demonstrated a likelihood of success on the merits of their claims that DSS is violating 42 U.S.C. § 608(f) by failing to provide case plans and periodic review in significant numbers of cases. And in part V.A. *supra*, I concluded that proof of a violation of the generalized case plan and periodic review requirements of section 608(f) also constitutes proof of noncompliance with the more stringent, detailed requirements for case plans and case review set forth in sections 675(1), (5)(B). From these findings and conclusions, it follows that plaintiffs have demonstrated a likelihood of success on the merits of their claim that the Commonwealth is in violation of

---

**16.** *See* notes 10 and 11 *supra*.

section 627(a)(2)(B). The evidence warrants a finding that DSS is failing to comply substantially with the dictates of sections 675(1), (5)(B).[17]

I turn next to the matter of proof of violation of section 675(5)(A), incorporated by reference in section 627(a)(2)(B). As noted previously, section 675(5)(A) requires that children in foster care have case plans calculated to achieve placement in the least restrictive setting available, consistent with the best interests and special needs of these children. Plaintiffs have exhibited a likelihood that they will succeed in proving that the Department does not provide case plans at all to significant numbers of foster children. If these children have no case plans, they cannot have case plans designed to place them in the least restrictive settings available. Thus, proof of violation of the case plan requirement of section 608(f)(1) suffices to establish noncompliance with the dictates of section 675(5)(A).

Accordingly, I conclude that plaintiffs have demonstrated a likelihood of success on the merits of their claims of noncompliance with 42 U.S.C. § 627(a)(2)(B).

### B. *Irreparable Injury*

For the reasons stated in part III.B. *supra,* I find that plaintiffs have sustained their burden of proving that Massachusetts' failure to comply with the requirements of sections 675(1), (5)(A), (B) threatens them with "serious harm which cannot be undone." *Massachusetts Coalition of Citizens v. Civil Defense Agency,* 649 F.2d 71, 74 (1st Cir.1981). It is true that the case plan and review requirements found in section 608(f) of Title IV–A are less stringent than those in sections 675(1), 5(A), (B) of Title IV–B. It does not follow, however, that plaintiffs are threatened with irreparable harm by reason of violation of the former, but are safe and secure in the absence of compliance with the latter. After investigating the plight of children in foster care, Congress found that the strengthened, concrete requirements of sections 675(1), (5)(A), (B) are necessary to assure the safety and welfare of children in foster care. The evidence in this case confirms that finding.

There is an additional reason why preliminary relief designed to secure compliance with section 627(a)(2)(B) is necessary to prevent irreparable injury in this case. Many of the children in the plaintiff class are not entitled to the protections afforded by Titles IV–A and IV–E, because they do not fit the definition of a "dependent child" set forth in 42 U.S.C. sections 608(a) and 672(h). *See* note 6 *supra.* If this court does not grant relief under Title IV–B, there is no guarantee that these children will receive the case plans and review essential to protect them from serious emotional and bodily harm.

**17.** In note 5 *supra,* I found, on the basis of evidence of widespread failure to provide case plans and periodic review in foster care cases in general, that plaintiffs have exhibited a likelihood of success on their claim that the Department is in violation of 42 U.S.C. § 608(f) by reason of failing to achieve substantial compliance with the case plan and periodic review requirements mandated for AFDC–FC children. This same proof warrants the inference that plaintiffs are likely to succeed on their claim that DSS is violating 42 U.S.C. § 627(a)(2)(B) by failing to achieve substantial compliance with the case plan and periodic review requirements mandated for all children in foster care, including AFDC–FC children.

It is theoretically possible that the Department could be in substantial compliance with section 627(a)(2)(B) while failing to comply substantially with section 608(f). This would be true if DSS were providing case plans and periodic review to a percentage of children not subject to the AFDC–FC program sufficiently great to elevate the total percentage of foster care cases in which these services are furnished to a figure close enough to 100 per cent to be "substantial compliance." As indicated above, plaintiffs' evidence of lack of case plans and periodic review does not distinguish between cases involving AFDC–FC children and other children in foster care under the state's supervision. I conclude that, at least for the purpose of the preliminary injunction, it is not essential that the evidence make such a distinction. The evidence shows that the Department's failure to provide case plans and periodic review to children in foster care is widespread. Defendants, as the parties having greater access to and control of any evidence distinguishing the provision of case plans and periodic review to AFDC–FC children and others in foster care, failed to submit any such proof. In these circumstances, such detailed proof will not be required of plaintiffs.

Accordingly, I conclude that the necessary showing of irreparable harm has been made.

### C. *Balance of Hardships*

In part III.C. *supra,* I weighed the balance of hardships to the parties and concluded that the irreversible harm threatened plaintiffs outweighs any hardship that will be imposed on defendants as a result of the granting of preliminary relief. The same considerations apply here. I therefore conclude that the injury threatened plaintiffs outweighs any burden placed on defendants by the award of preliminary relief designed to secure compliance with the requirements of 42 U.S.C. § 627(a)(2)(B).

### D. *The Public Interest*

For the reasons set forth in part III.D. *supra,* I conclude that the public interest will not be adversely affected—and indeed will be promoted—by the award of preliminary relief under section 627(a)(2)(B).

### VI.

### The Relief

Relief appropriate to bring Massachusetts' system into conformity with the dictates of 42 U.S.C. § 627(a)(2)(B), insofar as it incorporates the requirements of section 675(1), (5)(A), (B) is almost identical to that granted in part IV.B. *supra.* The only additional remedy to be provided here is a declaration of rights under section 575(5)(A), and an order to submit a revised program meeting the requirements of that provision, if defendants choose to continue to participate in the program for supplemental Title IV–B funds under section 627(a).

Defendants' obligations under section 627(a)(2)(B) of the Title IV–B program are enumerated in the order accompanying this opinion. Since these obligations under section 627(a)(2)(B) of Title IV–B are almost identical to the Commonwealth's prospective duties under the Title IV–E program, *see* part IV.B. *supra,* I conclude that it is appropriate to require simultaneous submission of the written report(s) demonstrating compliance with the requirements of the two programs. That way, if defendants choose to participate in both the Title IV–E program and the program for supplemental funds under section 627(a) of Title IV–B, they may submit one written report demonstrating revision of both programs in accordance with all the requirements set forth in this opinion.

In part IV.B. *supra,* defendants were ordered to notify the court, within seven days of the Commonwealth's submission of a Title IV–E plan to the Secretary, or of a decision by the Commonwealth not to submit such a plan. At the same time that defendants notify the court of the submission of a Title IV–E plan or decision not to submit one, defendants are directed to notify the court whether the Commonwealth intends to continue to participate in the program for supplemental funds under section 627(a) of Title IV–B. If the Commonwealth decides to continue to participate in the program for supplemental funds under section 627(a) of Title IV–B, defendants must submit, within 60 days of the date of the notification required above, a written report demonstrating that the Commonwealth's child welfare services program is in compliance with the requirements of section 627(a)(2)(B) enumerated in this opinion. If defendants choose not to participate in the program for supplemental funds under section 627(a), or fail to submit a revised plan demonstrating their compliance with the requirements of section 627(a)(2)(B), they will be restrained from spending supplemental funds allotted under that section. In addition, plaintiffs may apply to the court for a hearing on their constitutional claims.

### VI.

After the close of the hearings on this matter, defendants filed a motion requesting that, after "the court has reached a decision on liability and the appropriateness of a remedy," the court reopen the evidence "to permit defendants to present testimony and affidavits relating to the propriety and feasibility of the remedies" proposed by

plaintiffs. Motion to Reopen Evidence with Respect to Preliminary Injunction Remedy, July 9, 1982.

It has been over a year now since the commencement of the hearings on plaintiffs' motion for preliminary injunction. Much of the delay resulted from the hearing of collateral matters, necessitated because of actions taken by defendants during the course of this litigation. Evidence bearing on the feasibility of compliance with the relief requested has already been presented. The court has considered this evidence. It is now time for the court—and defendants—to act.

The motion to reopen the evidence will be denied.

### ORDER

For the reasons stated in the opinion of this date, the plaintiffs' request for preliminary injunction is allowed to the extent and on the terms stated in this order.

### I.

In order to receive federal funds under Title IV–E of the Social Security Act (42 U.S.C. §§ 671 et seq.), the Department of Social Services of the Commonwealth of Massachusetts ("DSS") must comply with the following requirements of 42 U.S.C. §§ 671(a)(16), 675(1), (5)(B):

A. DSS must provide, to each child meeting the definition of 42 U.S.C. § 672(a), a case plan, embodied in a written document in a single entry in the child's case file. The case plan must be developed within a reasonable period, to be established by DSS, but in no event later than 60 days from the time DSS, or another agency with which it contracts to provide care or services, assumes responsibility for providing services or placing the child. See 47 Fed. Reg. 30941 (July 15, 1982). The case plan must include the following:

(1) a written description of the type of home or institution (meeting the requirements of 42 U.S.C. § 672(c)) in which the child is to be placed;

(2) a written discussion of the appropriateness of the placement;

(3) a written discussion of how DSS plans to carry out the voluntary placement agreement entered into or judicial determination made for the child in accordance with 42 U.S.C. § 672(a)(1);

(4) a written plan—defined as, at a minimum, identification of one or more goals to be realized and a formulated course of action for providing services calculated to achieve those goals—for assuring that the child receives proper care;

(5) a written plan—defined as in (4) above—for assuring that services are provided

(a) to improve the conditions in the parents' home;

(b) to facilitate return of the child to his or her own home or otherwise achieve permanent placement for the child; and

(c) to address the needs of the child while in foster care; and

(6) a written discussion of the appropriateness of the services that have been provided to the child under the plan.

B. DSS must provide, to each child meeting the definition of 42 U.S.C. § 672(a), periodic review meeting the following requirements:

(1) At least once every six months, the status of the child shall be reviewed.

(2) The review shall be conducted by a court, or by administrative review. Administrative review means a review in which the parents of the child are invited to participate, conducted by a panel of appropriate persons, at least one of whom is not responsible for case management of, or the delivery of services to, either the child or the parents who are the subject of the review.

(3) Those conducting the review shall make determinations with respect to the following:

(a) the continuing necessity for and appropriateness of the child's placement;

(b) the extent of compliance with the case plan;

(c) the extent of progress that has been made toward alleviating or mitigating the causes necessitating placement in foster care; and

(d) projection of a likely date by which the child may be returned to the home from which he or she was removed or placed for adoption or legal guardianship.

(4) The results of the review, including the determinations specified in (3) above, shall be stated in writing and included in the child's case file.

C. DSS may not assign to its social workers a number of cases that is greater than the number of cases that workers are able to carry and simultaneously fulfill their obligations, as outlined in A. and B. above, to provide case plans and periodic review. In determining DSS's compliance with this requirement, the court will use the following guidelines:

(1) DSS's establishment and maintenance of an average ratio, in each DSS area, of twenty "generic" or "mixed" cases per caseworker will be taken as a rebuttable presumption that DSS is assigning to its social workers only the number of cases that workers are able to carry consistently with fulfilling their obligations, as outlined in A. and B. above, to provide case plans and periodic review.

(2) Only Social Workers I and II may be counted in computing the 1:20 ratio established in (1) above.

D. DSS, within 24 hours of receipt of a case by DSS, shall assign it to a Social Worker I or II—or to a supervisory Social Worker III who chooses to act as a direct service social worker in such cases and can do so consistently with performing his or her obligations, as outlined in A. and B. above, to provide case plans and periodic review. A case shall not be considered "assigned" until any existing case record has been delivered to the assigned social worker.

## II.

If DSS submits a Title IV–E plan to the Secretary of HHS, defendants are ordered to notify the court within seven days of the submission. If, on the other hand, DSS decides not to submit a Title IV–E plan, defendants are ordered to notify the court within seven days of making the decision.

If DSS submits a Title IV–E plan to the Secretary, defendants are ordered to file with the court, within 60 days of submission of the plan, a written report demonstrating that the Commonwealth's AFDC–FC program is in conformity with the requirements of §§ 671(a)(16), 675(1), (5)(B) outlined in I.A., B., C., and D. above.

It is further ordered that, if defendants fail to submit such a revised program within the 60-day period specified, (1) defendants will not thereafter spend any federal funds under the Title IV–E program and (2) plaintiffs may apply to the court for a hearing on their claims under the due process clause of the Fourteenth Amendment.

## III.

Under 42 U.S.C. § 627(a)(2)(B), in order to receive an amount of federal Title IV–B funds in excess of the allotment it would receive were the appropriation by Congress equal to $141,000,000, DSS must comply with the following requirements:

A. DSS must provide, to each child in foster care under the Commonwealth's supervision, a case plan, embodied in a written document in a single entry in the child's case file. The case plan must be developed within a reasonable time period, to be established by DSS, but in no event later than 60 days beginning from the time DSS, or another agency with which it contracts to provide care or services, assumes responsibility for providing services or placing the child. See Fed.Reg. 30941 (July 15, 1982). The case plan must include the requirements stated in (1)–(6) of I.A. above. In addition, the case plan must be designed to achieve placement in the least restrictive (most family-like) setting available and in close proximity to the parents' home, consistent with the best interests and special needs of the child. The case plan must include a written discussion of why the

placement is the least restrictive (most family-like) setting available and in close proximity to the parents' home, consistent with the best interests and special needs of the child.

B. The Department must provide, to each child in foster care under the Commonwealth's supervision, periodic review meeting the requirements stated in I–B above.

C. Same as I–C above.

D. Same as I–D above.

### IV.

At the same time that defendants notify the court of DSS's submission of a Title IV–E plan or decision not to submit the plan, defendants are ordered to notify the court whether DSS intends to continue to participate in the program for supplemental Title IV–B funds under 42 U.S.C. § 627(a).

If DSS does intend to continue to participate in this program, defendants are ordered to submit, within 60 days of the date of the notification required above, a written report demonstrating that the Commonwealth's child welfare services program is in conformity with the requirements of 42 U.S.C. §§ 627(a)(2)(B), 675(1), 675(5)(A), (B) outlined in III.A., B., C., and D. above. This written report may be consolidated with the written report required in II above.

It is further ordered that, if defendants fail to submit such a revised Title IV–B program within the 60-day period specified, (1) defendants will not thereafter spend any supplemental funds under 42 U.S.C. § 627(a) and (2) plaintiffs may apply to the court for a hearing on their claims under the due process clause of the Fourteenth Amendment.

### V.

Defendants' motion to reopen the evidence is denied.